Lincoln Park Traps, Appellee, v. Chicago Park District et al., Appellants.

Gen. No. 41,519.

108

Opinion filed May 2, 1944.

JOHN O. REES and KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, all of Chicago, for appellants; JOSEPH B. FLEMING, PHILIP A. LOZOWICK, JOSEPH H. PLECK and JOHN M. O'CONNOR, JR., all of Chicago, of counsel.

ZIMMERMAN & NORMAN, of Chicago, for appellee; EDWARD A. ZIMMERMAN and DONALD R. KERR, both of Chicago, of counsel.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This proceeding was instituted by plaintiff, Lincoln Park Traps, to restrain defendants Chicago Park District and the commissioners thereof (sometimes hereinafter for convenience referred to collectively as the Chicago Park District), from "molesting or in any way interfering with the rights and privileges acquired by Lincoln Park Traps" under a written lease entered into between said plaintiff and the Commissioners of Lincoln Park on November 26, 1920. Defendants' motion to strike and dismiss plaintiff's amended complaint was denied and a temporary injunction issued. Defendants thereupon filed an answer, to which plaintiff filed a reply. This answer was later withdrawn by leave of court and defendants stood upon their motion to strike and dismiss. A decree was then entered which found in part that "the agreement between the plaintiff, Lincoln Park Traps and the Commissioners of Lincoln Park as set out in the said

Amended Bill of Complaint, under and by virtue of which the said plaintiff became possessed of and is now in possession of the premises described in the said complaint, is in full force and effect and is binding upon the defendants as successors to the Commissioners of Lincoln Park, and that subject to the provisions of the said agreement it shall so remain until terminated in accordance with the said provisions;'' and ordered that a permanent writ of injunction issue restraining the Chicago Park District and the commissioners thereof from ''molesting or in any way interfering with the rights and privileges acquired'' by plaintiff under the aforesaid agreement. Defendants appeal from the foregoing portions of the decree.

The amended complaint, which is rather voluminous, alleged substantially that the Commissioners of Lincoln Park, pursuant to an act of the legislature of 1895, had reclaimed certain land from the bed of Lake Michigan and devoted a portion thereof to trap-shooting; that plaintiff, Lincoln Park Traps (a corporation not for profit), was organized to promote the sport of shooting and to conduct and maintain a shooting club; that on November 26, 1920 plaintiff entered into an agreement with the Commissioners of Lincoln Park whereby the latter leased to it a portion of the aforesaid reclaimed land, which was a part of Lincoln Park, for a period of 26 years at an annual rental of $50.

The complaint further alleged that pursuant to and in accordance with the terms of the lease and according to plans and specifications approved by the Commissioners of Lincoln Park plaintiff erected on the leased premises a clubhouse at a cost of over $40,000 and constructed on said premises various skeet houses, traps, pits, barricades, fences and sidewalks at a cost of approximately $10,000; that ever since plaintiff took possession of the leased premises and constructed said clubhouse and trapshooting facilities, ''members of the

general public'' have not only been permitted but they have been invited to use same on a ''basis of full equality with the members of the plaintiff club;'' that adequate supplies of ammunition and targets have been maintained and furnished to ''members of the general public'' who desired to make use of the trapshooting facilities, ''at a price not sufficient to cover the cost of shells and targets plus the addition of a reasonable charge for overhead expenses;'' and that ''many thousand members of the public'' have taken advantage of the facilities so provided.

It was then alleged that on September 27, 1938 an order was entered at a meeting of the Commissioners of the Chicago Park District, successors of the Commissioners of Lincoln Park, which declared plaintiff's lease forfeited because of its failure to pay the rental stipulated in said lease for the years 1935, 1936, 1937 and 1938 and which directed Lincoln Park Traps to surrender possession of the demised premises to the Chicago Park District and to remove its effects therefrom within 30 days; that on the day of its entry notice of this order was served on plaintiff; that plaintiff immediately tendered payment of the rent then in arrears, which tender was refused; that the Chicago Park District refused to reinstate plaintiff's lease and to waive the forfeiture and continues to demand possession; that plaintiff is informed and believes that the Chicago Park District through its police officers will ''close the property'' and prevent plaintiff's employees and members from using same; and that plaintiff will thereby suffer irreparable damage.

The complaint concluded with the prayer that a temporary injunction be issued restraining defendants from interfering with the rights and privileges acquired by plaintiff under its lease and that upon final disposition of the cause a permanent writ of injunction issue to like effect or that as alternative relief defendants be required to account and pay to plaintiff all

moneys expended by it for making the improvements and installing the facilities on the demised premises.

Defendants' motion to strike and dismiss challenged the validity of the lease, asserting that it was illegal and void because it was beyond the power and authority of the Commissioners of Lincoln Park and its officers to execute the same, that the lease was against public policy and that therefore plaintiff was not entitled to the relief sought.

The decree appealed from refers to the lease as an "agreement." Plaintiff seems to prefer to designate it as an "agreement" and asserts that in any event "it was not a lease in the ordinary sense but more in the nature of a concession." There can be no question but that the instrument involved herein was intended to be a lease when it was executed by the parties thereto. However, we fail to perceive any difference in its legal effect whether it is designated as a lease, a contract, an agreement or a concession.

The land demised to plaintiff was within the confines of Lincoln Park and the only purpose for which the legislature authorized it to be used was as a public park. Park districts are created for the purpose of establishing, maintaining and governing public parks for the recreation, health and benefit of the general public. The law is well settled that a park board cannot lease a portion of its lands to a private individual, club or corporation, when by the terms of such lease the demised land and the facilities located thereon are not available equally to all the people of the State of Illinois. In *Quinn v. Irving Park District*, 207 Ill. App. 449, where the commissioners of the Irving Park District sought to restrict the use of the swimming pool and gymnasium in one of its parks to the residents of such park district, it was held that the park and the swimming pool and gymnasium located therein "are held for the use of the citizens of the State generally." In *LePitre v. Chicago Park District*, 374 Ill.

184, in discussing the purpose of the creation of the South Park Commissioners, also now superseded by the Chicago Park District, the court said at p. 188:

"The language used in the act of 1869 directing that the lands when acquired should be held, managed and controlled by the *public* park for the recreation, health and benefit of the *public free to all persons forever,* leaves no doubt as to the legislative intent to create a corporation for the primary purpose of rendering a governmental service to the general public. The promotion of health, comfort and recreation for the general public is, as was said in *Gebhardt v. Village of LaGrange Park,* 354 Ill. 234, 'among the aims of government. . . . To attain such an object is one of the primary purposes of government.' The powers given the commissioners to construct and maintain drives and to have general control and management of the parks were granted in the interests of establishing and maintaining a park for public use and not in the promotion of a purely corporate purpose. The direction in the statute that the park shall be used by the *public, generally,* forever, definitely fixes the ones in whose interest the park was created." (Italics ours.)

In *McPike v. Illinois Terminal R. Co.,* 305 Ill. 298, the owner of a parcel of land in the City of Alton dedicated it as "park grounds of the city never to be owned as individual or private property" and subsequently the City of Alton leased a portion of the dedicated land to a private individual. There, in holding that the lease was void, the court said at pp. 300 and 301:

"The first question arising in this case is whether or not plaintiff in error, under the averments of his bill, is entitled to the injunction prayed. It has long been the settled law in this State that where lands are dedicated to the public for particular purposes they can be used for such purposes only. For those purposes the city may improve, fence, beautify and control them and adopt all necessary rules and regulations concern-

ing their management. Acting in this capacity, the city occupies the relation of trustee of said premises, holding them in trust for the benefit of the public. *The right to the use of such property is not limited to the citizens of the city in which such lands are dedicated, but the citizens of the State generally have an equal right in them and a proper enjoyment of them. . . . It is equally well settled in this State that the city, as trustee of its streets, public squares and parks, has no rightful authority to grant them for any purpose inconsistent with the public use.* (*Kreigh v. City of Chicago,* 86 Ill. 407; *City of Quincy v. Jones,* 76 id. 231.) *It can not be questioned that a lease of public premises to private individuals for private purposes is the exercise of a control over such premises by the city inconsistent with their use as public property.* The very nature of a lease precludes the use of the premises by the public and gives to one individual the exclusive right to possess and control the same. It follows that the lease entered into between plaintiff in error and the city council of the city of Alton in 1902 is not a valid lease and therefore affords no basis for the issuance of an injunction in this case." (Italics ours.)

It is clear from the foregoing authorities that all lands, the title to which is in commissioners of park districts, are held in trust for the equal benefit of all of the people of the State, that the facilities of park districts are for the equal benefit of all the people of the State and that park districts cannot operate their facilities or permit them to be operated in such a manner that a preferential use thereof is granted to any one person or to any group of persons.

Defendants contend that the lease granted to plaintiff was "ultra vires the powers of the Commissioners of Lincoln Park, was against public policy, and therefore illegal and void." The lease granted plaintiff gun club and its members the unrestricted use of the demised premises and the club building and facilities

erected and installed thereon. It was provided in the first paragraph of the lease that the demised premises were "to be used by the Lessee for the sole purpose of Trap Shooting," in the fourth paragraph thereof that Lincoln Park Traps "agrees to construct, at its own expense" a "building and all necessary appliances, devices and accessories, and particularly including four traps properly installed, *for its use and convenience* in Trap, Rifle and Revolver Shooting on said premises herein leased," and in the tenth paragraph thereof that it "agrees that it will not sell meals or refreshments of any kind upon said premises, *except to club members, employees and guests.*" (Italics ours.) The only use of plaintiff's facilities which the lease even pretended to reserve for the public generally is that found in paragraphs 8 and 12 thereof.

Paragraph 8 provides in part as follows:

"The Lessee will make ample provision for, and install lockers or storage space in said building for the use not only of its own members but for a reasonable number of non-members as well who shoot at the traps with sufficient frequency to justify the maintenance of lockers or storage space for them. . . ."

Paragraph 12 provides as follows:

"The Lessee will make all necessary arrangements so as to permit non-members who shoot at the traps with sufficient regularity to justify the maintenance of a locker for them, to rent available locker or storage space at the Club House, and to purchase targets and shells from the Club at a rate not exceeding twenty per cent (20%) above that paid by members, and will permit all such non-members to shoot at the traps who conform to the rules and regulations of the club."

Even a cursory examination of the provisions of the foregoing paragraphs demonstrates that plaintiff gun club was authorized under the lease to permit non-members thereof (the public) only a limited and restricted use of its trapshooting facilities, while, as al-

ready shown, the members of said club had the unrestricted use of such facilities.

.Just what use of its facilities was plaintiff required to afford the public under paragraphs 8 and 12 of the lease? It will be noted that under paragraph 8 it was contemplated that in constructing its clubhouse plaintiff would make ample provision for the installation of lockers for its own members and that they would be entitled to a locker regardless of how seldom or how often they might care to "shoot at the traps" or even if they never did any shooting. Lockers were to be installed for "a reasonable number of non-members" but the only non-members who would be permitted to use them were those "who shoot at the traps with sufficient frequency to justify the maintenance of lockers" for them. It will also be noted that under paragraph 12 non-members of plaintiff gun club could not "shoot at the traps" at all unless they were first able to rent lockers, that they could not rent lockers unless they shot at the traps "with sufficient regularity to justify the maintenance of a locker for them" and that a non-member who was fortunate enough to qualify for the use of a locker was then permitted "to purchase targets and shells from the club at a rate not exceeding . . . 20% above that paid by members."

As already stated, paragraphs 8 and 12 contained the only provisions of the lease that even pretended to afford the public the use of plaintiff's facilities and it is obvious that any use permitted the general public of the trap shooting facilities on the demised premises under said paragraphs was seeming rather than real. Under the lease the authority to determine whether non-members (the public) met the test of "sufficient frequency" or "sufficient regularity" was vested solely in plaintiff. The lease provided no standard by which plaintiff's facilities were to be made available to the public on any basis of equality with its own members. The reasonableness of the number of non-

members who were to be permitted to use plaintiff's facilities and the frequency and regularity of their shooting were left entirely to the fancy, whim or caprice of plaintiff gun club. Thus there was no restraint on plaintiff's authority under the lease to discriminate against the use by the general public of the demised park land and the facilities constructed and installed thereon. There was no provision in the lease for the use of plaintiff's clubhouse by the public and plaintiff was prohibited thereunder from selling "meals or refreshments of any kind upon said premises, except to club members, employees and guests." Plaintiff club had 250 members when the complaint herein was filed and membership therein was limited. The by-laws of Lincoln Park Traps restricted its membership by providing that life memberships therein were limited to 100, that the adverse vote of only one director was sufficient to deny a life membership and that resident memberships were limited in number within the discretion of its board of directors.

The lease granted to plaintiff what was tantamount to an exclusive use of a portion of a public park, since it could under the terms thereof effectually bar the general public from the use of its clubhouse and its shooting facilities. It follows that such lease entered into between plaintiff and the Commissioners of Lincoln Park was not a valid lease and therefore it affords no basis for the issuance of an injunction in this case.

The only answer made by plaintiff in its brief to defendants' contention that the lease was and is illegal and void is that "since the Commissioners of the Park had the right to make and maintain the improvements and to install the equipment necessary to the sport of trap shooting in its various forms, they had the right to contract with the plaintiff to do these things." Whether or not a park district may under proper circumstances and in a proper manner contract with others to operate certain facilities on a portion of its

land is entirely beside the question as to whether the lease involved herein is illegal and void. Plaintiff cites *Bailey v. City of Topeka,* 97 Kan. 327, 154 Pac. 1014; *City of Port Arthur v. Young* (Tex. Civ. App.), 37 S. W. (2d) 385; *El Paso Union Passenger Depot Co. v. Look* (Tex. Civ. App.), 201 S. W. 714; *Vale v. City of San Bernardino,* 109 Cal. App. 102, 292 Pac. 689 and *Hagerman v. South Park Com'rs,* 278 Ill. App. 33, as authorities which sustained the validity of leases of public lands made by park districts or other municipalities. It would serve no useful purpose to discuss the foregoing cases, since the facts therein are not comparable to the facts here and since in not one of them was there a lease involved which granted special privileges to the members of a private club.

Plaintiff's amended complaint alleged in effect that, notwithstanding the fact that it was authorized under the lease to give its members preferential use of its clubhouse and facilities and to discriminate against the public in the use thereof, it not only permitted but invited "members of the general public" to use its facilities on "a basis of full equality with the members of the plaintiff club;" and that it furnished adequate supplies of ammunition and targets to "members of the general public" who desired to make use of its trap shooting facilities "at a price not sufficient to cover the cost of shells and targets plus the addition of a reasonable charge for overhead expenses." While the well-pleaded allegations of fact in plaintiff's complaint were admitted by defendants' motion to strike, its alleged practice in the operation of its facilities has no bearing on the validity of its lease. It predicated its right to injunctive relief on the lease and whether it is entitled to such relief depends entirely on the lease itself. Since, as already shown, the Commissioners of Lincoln Park had no rightful authority to grant the demised premises for any purpose inconsistent with the public use thereof, the lease was void *ab initio.*

Plaintiff contends that defendants are estopped from asserting the illegality of the lease. The subject matter of the lease pertained to the exercise of a governmental function. In *Benton v. Kaneville Community High School Dist. No. 147*, 250 Ill. App. 6, it was said at p. 9: "The doctrine of estoppel does not apply to the exercise of governmental functions. (*Otis El. Co. v. City of Chicago*, 263 Ill. 419; *People v. Brown*, 67 Ill. 435; *Washingtonian Home of Chicago v. City of Chicago*, 157 Ill. 414.) Estoppel does not apply to a matter in the nature of a public right. (*People ex rel. Slusser v. Gary*, 196 Ill. 310.)"

In the amended complaint plaintiff asks as alternative relief that defendants be required to account to it for the moneys expended in the erection of its clubhouse and in the construction and installation of the trapshooting facilities on the demised premises, in the event it is held that it is not entitled to injunctive relief. Plaintiff having sustained no damages when its complaint was filed herein, it had no accrued right to an accounting against defendants and therefore its claimed right to require defendants to account for damages it might sustain in the future is prematurely asserted. "Under no circumstances will a judgment or decree take effect upon rights not then existing." *Deke v. Huenkemeier*, 289 Ill. 148, 154.

Other points have been urged and considered but in the view we take of this case we deem further discussion unnecessary.

For the reasons stated herein that portion of the decree appealed from is reversed and the cause is remanded with directions to allow defendants' motion to strike and dismiss plaintiff's amended complaint for want of equity.

*Reversed and cause remanded with directions.*

FRIEND, P. J., and SCANLAN, J., concur.